

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES EX REL. | ) | |
| FRED FANGMAN, | ) | Civil Action No. 6:08-cv-1095-ORL-31DAB |
|  | ) | |
| Plaintiff-Relator, | ) | **FILED IN CAMERA AND** |
|  | ) | **UNDER SEAL** |
| v. | ) | |
|  | ) | Jury Trial Requested |
| MELBOURNE INTERNAL MEDICINE | ) | |
| ASSOCIATES, P.A., | ) | |
|  | ) | |
| Defendant. | ) | |

## COMPLAINT

1.

This is a *qui tam* action by Plaintiff-Relator Fred Fangman ("Relator"), for himself and on behalf of the United States, to recover damages and civil penalties arising from Defendant's actions in violating the False Claims Act, 31 U.S.C. § 3729 *et seq.*. As set forth below, Defendant knowingly presented or caused to be presented numerous false or fraudulent claims for payment or approval to federal healthcare programs; and knowingly made, used, or caused to be made or used false records or statements to get false or fraudulent claims paid or approved.



## I.      JURISDICTION AND VENUE

### 2.

This action arises under the False Claims Act, 31 U.S.C. § 3729 *et seq.*

### 3.

Jurisdiction over this action is vested in this Court by 31 U.S.C. § 3732(a), 31 U.S.C. § 3730(h), and 28 U.S.C. § 1331, in that this action arises under the laws of the United States.

### 4.

Venue is proper in this district under 31 U.S.C. § 3732(a). The Defendant can be found, resides, and transacts business within the district, and the acts forming the basis of this action occurred within the district.

## II.      THE PARTIES AND RELATED ENTITIES

### 5.

Defendant Melbourne Internal Medicine Associates, P.A. ("MIMA") is a physician-owned medical practice based in Brevard County, Florida. MIMA has more than 120 physicians in 25 practice specialties. Dr. Joseph McClure is the CEO and medical director of MIMA.

### 6.

MIMA has 18 offices in and around Brevard County, including Melbourne, Palm Bay, Viera, Indialantic, and Indian Harbour Beach. These consist of several small offices containing primary care physicians, as well as larger offices containing specialist physicians and diagnostic facilities. One of these specialist facilities is the MIMA Cancer Center, located in Melbourne, Florida.

2

7.

The MIMA Cancer Center opened in August 2003. At the MIMA Cancer Center, patients may receive a variety of treatments for cancer, including chemotherapy, surgery, and radiation therapy. Dr. Todd Scarbrough is a radiation oncologist and the Medical Director of the MIMA Cancer Center. In addition to Dr. Scarborough, there have historically been two or three other radiation oncologists on staff at the center.

8.

Relator Fred Fangman is currently the director of radiation oncology at MIMA Cancer Center. When the center opened in August 2003, Relator was hired as the chief radiation therapist, overseeing the operations of the therapy department, personnel, and budgeting. In 2004, Relator was promoted to office manager and director of radiation therapy. In 2007, after complaining about the improper billing practices discussed herein, a new boss was placed over Relator, although he remains as director of radiation oncology.

### III.    MIMA'S FRAUDULENT ACTIVITIES

9.

In his capacity as director of radiation oncology, Relator has acquired first-hand knowledge of various ways in which MIMA has deliberately sought to increase billings by submitting claims in violation of Medicare guidelines. As discussed below, MIMA has submitted thousands of claims for Image-Guided Radiation Therapy (IGRT), where the therapy was performed without required physician supervision. In addition to violating clear Medicare guidelines, the lack of physician supervision raises a significant issue of patient safety as well as medical efficacy. MIMA has also routinely submitted

claims for Intensity Modulated Radiation Therapy (IMRT) that are not medically necessary and not properly documented in the medical record. Furthermore, MIMA has developed a policy of submitting add-on claims for "special treatment procedures" and "special physics consults" for nearly all of its radiation patients, although such claims are intended to be the exception rather than the rule. In nearly all such cases, the medical record fails to contain adequate justification for such claims. As a result of these practices, MIMA has received millions of dollars from Medicare that it was not entitled to receive.

A. Failure to provide appropriate physician supervision during Image-Guided Radiation Therapy (IGRT) procedures

    1. Physician supervision requirements

10.

42 C.F.R. § 410.32(b) sets forth the requirement that diagnostic tests are not reasonable and necessary, and hence are not payable, unless they are performed under the appropriate level of supervision by a physician:

> (b) Diagnostic x-ray and other diagnostic tests -- (1) Basic rule. Except as indicated in paragraph (b)(2) of this section, all diagnostic x-ray and other diagnostic tests covered under section 1861(s)(3) of the Act and payable under the physician fee schedule must be furnished under the appropriate level of supervision by a physician as defined in section 1861(r) of the Act [42 U.S.C. § 1395x(r)]. Services furnished without the required level of supervision are not reasonable and necessary (see § 411.15(k)(1) of this chapter).

11.

42 C.F.R. § 410.32(b)(3) sets forth three different levels of physician supervision – general, direct, and personal – defined as follows:

> (i) General supervision means the procedure is furnished under the physician's overall direction and control, but the physician's presence is not

4

required during the performance of the procedure. Under general supervision, the training of the nonphysician personnel who actually perform the diagnostic procedure and the maintenance of the necessary equipment and supplies are the continuing responsibility of the physician.

(ii) Direct supervision in the office setting means the physician must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician must be present in the room when the procedure is performed.

(iii) Personal supervision means a physician <u>must be in attendance in the room during the performance of the procedure</u>.

(emphasis added).

12.

Each year, CMS publishes a Medicare Physician Fee Schedule Database (MPFSDB), setting forth, among other things, the required physician supervision level for various CPT codes. In the relevant line item on the MPFSDB, Code 01 means that the "[p]rocedure must be performed under the general supervision of a physician." Code 02 means that the "[p]rocedure must be performed under the direct supervision of a physician." Code 03 means that the "[p]rocedure must be performed under the personal supervision of a physician."

2.      Image-Guided Radiation Therapy and CPT 77421

13.

Physicians have long used radiation therapy to treat cancerous tumors. The goal of radiation therapy is to deliver the target dose of radiation to the affected area, while minimizing the amount of radiation delivered to surrounding body areas. One of the principal factors affecting this issue is the proper positioning of the patient on the treatment unit at the time the radiation is administered.

14.

In recent years, physicians have increasingly utilized a process known as Image-Guided Radiation Therapy (IGRT) in order to more precisely target the delivery of radiation to affected areas. Under IGRT, the patient is placed on the treatment unit, where he is subjected to imaging procedures, such as ultrasounds, CTs, or stereoscopic x-rays. After the images are reviewed, the patient's position is adjusted as necessary to allow for precise delivery of radiation to the tumor, while minimizing the amount of radiation delivered to adjacent body areas.

15.

When used properly, IGRT helps ensure that the patient is properly aligned in the treatment unit before the radiation treatment is delivered. If used improperly, IGRT may both reduce medical efficacy (by failing to deliver the target dose to the tumor) and negatively impact patient health (by delivering excess radiation to adjacent areas).

16.

CMS uses several CPT codes which allow physicians to be paid for their actions in guiding the delivery of therapy during IGRT procedures, and has specified the required level of physician supervision for each code. The level of physician supervision required depends on the type of imaging technology used – ultrasound, CT, or stereoscopic x-rays. A description of these CPT codes and their corresponding supervision levels is as follows:

| CPT Code | Description | Supervision |
|---|---|---|
| 76950 | Ultrasonic guidance for placement of radiation therapy fields | General |
| 77014 | Computed tomography guidance for placement of radiation therapy fields | Direct |
| 77421 | Stereoscopic X-ray guidance for | Personal |

6

localization of target volume for the
delivery of radiation therapy

17.

Thus, where ultrasound is used, the physician need only provide "general" supervision, including the training of the nonphysician personnel performing the procedure, and need not be present in the office.  When CT is used, the physician must provide "direct" supervision – i.e., he must be present in the office suite and immediately available to provide assistance, but need not be in the procedure room.

18.

When stereoscopic x-rays are used, however, the physician must provide "personal" supervision, which means that he "must be in attendance in the room during the performance of the procedure."  This requirement reflects the heightened need for real-time physician involvement in the review of stereoscopic x-ray images and the repositioning of the patient based on such review before radiation is administered.  If the physician is not present in the room, then the stereoscopic x-ray guidance is deemed not reasonable and necessary, and the service is not payable by Medicare.

3.   MIMA has systematically and knowingly violated the personal supervision requirement

19.

As Director of Radiation Oncology for MIMA, Relator has first-hand knowledge of MIMA's practices with respect to IGRT procedures.  All such procedures are performed at the MIMA Cancer Center in Melbourne, Florida, where Relator's office is located.  Relator has daily contact with the radiation oncologists based at the MIMA Cancer Center, as well as with the technicians and administrative staff at such center.  On

any given day, approximately 80 IGRT procedures are performed at the MIMA Cancer Center, most of which are billed to Medicare or Medicaid.

20.

Since CPT code 77421 was adopted in 2006, MIMA has almost never had a physician present in the treatment room during an IGRT procedure.  To the contrary, IGRT procedures are universally performed by radiation therapists with no real-time involvement from the radiation oncologist, who would be in his office or elsewhere.

21.

Previously, after taking the stereoscopic x-ray images in the treatment area, the therapist would place a stamp on the x-rays stating, "Reviewed Daily IGRT images and compared to Previous Images. No additional shifts needed," and would proceed with the radiation treatment.  At no time was the physician called to the treatment area to approve the IGRT prior to treatment.  Rather, the physician would review and sign the images at the end of the day or at a later time.

22.

MIMA's current procedure involves the therapist taking the images and emailing them to the physicians.  However, the therapists do not wait to receive approval from the physicians before proceeding with the treatment.  Rather, the physicians' computers are set up to auto-respond "Images received for 'real time' review.  Proceed according to policy."  The physicians have been given PDAs to carry with them to enable them to view the images; however, at no time has it been the practice for physicians to review images in real time and provide guidance to the therapists prior to the administration of the radiation therapy.  In most cases, the physicians do not review the images until the

end of the day, or even the end of the patient's entire course of treatment. Indeed, many times code 77421 has been billed when the physician was away on vacation.

23.

MIMA and its physicians are fully aware of the personal supervision requirement with respect to code 77421. Indeed, the American Society for Therapeutic Radiology and Oncology (ASTRO) and the American College of Radiology (ACR) publish an annual reference book called "ASTRO/ACR Guide to Radiation Oncology Coding," which MIMA receives, and which discusses the requirement of personal supervision. Moreover, ASTRO (of which Dr. Scarbrough is a member) has published for its members a PowerPoint presentation entitled "Documentation and Billing of IGRT," which expressly discusses the necessity for personal supervision with respect to code 77421.

24.

In addition, Relator has repeatedly advised the MIMA physicians, in particular Dr. Scarbrough, they are not in compliance with Medicare supervision requirements. Indeed, Relator recently sent an email inquiry to MIMA's consultants to clarify the personal supervision requirement:

> Good afternoon Jim!!!! I'm sorry I wasn't able to attend last weeks SATRO meeting. I have a "brewing" situation here that I really need your help!!!!!!! I am preparing to send you 21 charts for a spot audit but I have an issue that can't wait.

> IGRT (your favorite subject)

> Currently we do the following:

> After the IGRT images are taken the therapist copies the images with the shifts and e-mails them to the physician. The physician's computer has been set up to auto reply "images received and proceed according to policy". The physician will approve the document electronically in Aria the same day or a

9

day or two later. Does our current procedure for IGRT meet the requirements of the code??

25.

After the consultant responded that the current procedure did not meet the requirements for code 77421, Relator showed the response to one of the radiation oncologists, who asked Relator to relay the following comments to the consultant:

> I'd clarify with him that our images are done with exactrac or OBI bony match, so can we charge any of his described codes? I'd also ask him to elaborate a bit more on what "Real time" means. (even though it sounds like a stupid question) does real-time mean before the treatment that same day or before the next treatment tomorrow. Also, ask him to clarify what if any role the emailed response serves for us from a documentation point of view. If the images are not reviewed prior to treatment that day, is there any reason to bother with documenting that they were sent and replied to before treatment that day?

26.

In response, the consultant confirmed that "[t]he supervision level is 3, meaning personal supervision. This means it must be done 'live' as it is happening for the physician to bill it professionally, technically or globally."

27.

MIMA recently had a chart audit performed by American Medical Accounting and Consulting (AMAC). This audit is replete with comments such as "no daily IGRT verification sheet in chart for dates of service of 2/5/08, 2/15/08. Are these done in real time?" The audit summary noted that "IGRT code 77421 can only be charged if the procedure was done in 'real' time prior to the treatment."

28.

Relator estimates that, since 2006, MIMA has billed Medicare nearly $4 million under code 77421. All of these claims are medically unnecessary due to the lack of personal supervision by a physician, and thus not payable by Medicare. Moreover, the failure to provide required physician supervision in the critical process of patient adjustment prior to radiation treatment raises significant issues of patient safety and medical efficacy.

B.     MIMA's use of medically unnecessary and improperly documented IMRT procedures

29.

As stated in the relevant Local Coverage Decision, "Intensity Modulated Radiation Therapy (IMRT) is a computer-based method of planning for, and delivery of patient specific, spatially modulated beams of radiation to solid tumors within a patient." IMRT differs from conventional therapy in that it shapes radiation beams to closely approximate the size of the tumor being treated. The intensity of the radiation in IMRT can be changed during treatment to spare more adjoining normal tissue than during conventional radiation therapy. Thus, "IMRT delivers a more precise radiation dose to the tumor while sparing the surrounding normal tissues by using non-uniform radiation beam intensities determined by various computer-based optimization techniques." IMRT is therefore indicated in "situations in which extremely high precision is required." Where such high precision is not required, conventional radiation therapy may achieve the same or better results at significantly lower cost. IMRT is billed using various CPT codes, including 77301 and 77418.

30.

Because IMRT is significantly more expensive than conventional radiation therapy, physicians may have a financial incentive to overutilize IMRT in situations where other treatment methods may achieve the same or better results. Consequently, Medicare has placed limits on when IMRT may be used, and has required that physicians document the reasons why IMRT is necessary. As stated in the relevant Local Coverage Decision:

> IMRT is not a replacement therapy for conventional radiation therapy methods. Medicare will consider IMRT reasonable and necessary in instances where sparing the surrounding normal tissue is essential and the patient has at least one of the following conditions:
>
> 1. Important dose limiting structures adjacent to but outside the Planned Treatment Volume (PTV) are sufficiently close and require IMRT to assure for safety and morbidity reduction.
>
> 2. An immediately adjacent volume has been irradiated and abutting portals must be established with high precision.
>
> 3. Gross Tumor Volume (GTV) margins are concave or convex and in close proximity to critical structures that must be protected to avoid unacceptable morbidity.
>
> 4. Only IMRT techniques would decrease the probability of grade 2 or grade 3 radiation toxicity, as compared to conventional radiation in greater than 15 percent of radiated similar cases.
>
> Currently, IMRT is indicated for primary brain tumors, brain metastasis, prostate cancer, lung cancer (with special provision for organ motion), pancreas cancer and other upper abdominal sites (with special provision for organ motion), spinal cord tumors, head and neck cancer, adrenal tumors, pituitary tumors, gynecologic tumors, and situations in which extremely high precision is required.

31.

The LCD also requires that the provider adequately document the justification for

using IMRT, stating as follows:

> Medical record documentation maintained by the provider must indicate the
> medical necessity for IMRT, and include all of the following:
> ...
> 2. A statement by the treating physician documenting the special need for
> performing IMRT on the patient in question, rather than performing
> conventional or three-dimensional treatment planning and delivery. The
> physician must address the other organs at risk and/or adjacent critical
> structures.

32.

The leading radiation oncology society, ASTRO, has itself recognized the danger

that arises when physicians overprescribe IMRT based on their financial incentives.  In

an April 17, 2008 letter to the Administrator of CMS, ASTRO noted that:

> Additionally, we have received allegations that because of the financial
> incentive to use "in office" ancillary services, those practices that choose to
> drop radiation therapy services into their practice may prescribe external
> beam radiation (IMRT) to the vast majority, if not all of their patients. Thus,
> patients who might otherwise choose to undergo a prostatectomy or who
> would choose brachytherapy as the preferred treatment no longer have the
> choice among options. In this instance, there is overuse of one particular
> treatment modality over other equally appropriate options due to the financial
> incentives of the diagnosing physician. All patients facing the diagnosis of
> cancer face a great deal of uncertainty about their future. Every patient
> deserves to have all treatment options, with their associated risks and benefits
> carefully spelled out for them by their physician. Patients should not be
> steered to a specific treatment because the physician has a financial incentive.

33.

For many years, MIMA has routinely used IMRT, rather than conventional

radiation therapy, in nearly all patients, regardless of medical necessity.  The industry

standard for use of IMRT is approximately 50% -- i.e., 50% of patients are treated with

IMRT instead of other procedures.  At the MIMA Cancer Center, however, the figure is

13

80-95%, and has been increasing over time. Moreover, MIMA physicians routinely fail to document the medical necessity of IMRT tests.

34.

MIMA's problems with IMRT use and documentation have been repeatedly noted in outside audits and internal discussions. In 2004, American Medical Accounting and Consulting (AMAC) performed an audit of MIMA, and issued an executive summary dated January 24, 2004. This summary noted, among other things, the following:

> Need medical necessity on all IMRT cases for future cases that are performed.
> ...
> IMRT should not be billed for abdominal cases or lungs unless provisions are made for organ motion. Please refer to you LMRP.
> ...
> Medical necessity is necessary for all IMRT cases. Currently breasts are questionable for IMRT; please refer to article in red journal.

35.

AMAC conducted another audit in early 2005, and the executive summary specifically discussed MIMA's high percentage of IMRT cases:

> The IMRT percentage here is about 80% of patient treated which is very high. The national average is about of 15% - 25% with no IGRT and no motion equipment. With new imaging and placement capabilities such as gating this would be about 30% - 60% depending upon the disease sites treated.

36.

The summary also noted problems with MIMA's documentation of medical necessity for IMRT procedures:

> IMRT processes, charting, documentation and typical cases will be discussed in our close out meeting with all present. When performing IMRT procedures, Medicare states there needs to be at least 5 segments per gantry angle, step and shoot and sliding windows. There needs to be "medical necessity" for the procedure. This medical necessity needs to be at least

specific to the disease site. Please make sure you follow local coverage determination on ICD-9 codes that support medical necessity. If the LCD does not contain that code write CMS/Medicare and have them add that ICD-9 code, i.e. Bladder. In the chart documentation folder on the CD there are examples of this documentation.

Please remember the following:

1) When IMRT for lung patients is provided the providers need proof that the center has some method for organ motion.

2) You may bill a 77295 3-D plan for a simulation prior to the IMRT plan. Do not bill a plan after performing, documenting and planning an IMRT. The new edits do allow a 3-D to be charged (not a 2-D plan) later in treatment if a 3-D conformal therapy is started. One may only bill one physics plan per set up then another at boost time.

3) IMRT for breast treatment has been questioned in the Red journal last year. Some practices are billing this as 3-D conformal and standard treatment. Please make sure medical necessity is documented.

4) Medical Necessity is important and a description of this needs to be in the chart (examples supplied) as well as descriptive treatment plan by the physician like the ones currently dictated in the consult.

37.

After this audit was performed, there was a "roundtable" discussion between MIMA and the auditors to discuss the issues raised therein. Present at this meeting were Jim Hugh, vice-president of AMAC; Dr. Scarbrough; Dr. Golden; Al O'Connell, MIMA's chief administrative officer; Brenda Bonenfant; and Relator. During this meeting, it became apparent to Relator that Dr. Scarbrough and Dr. Golden had no intention of addressing the problems raised by the audit. Relator had several discussions over the following year with MIMA administrators, including Dr. Joseph McClure, MIMA's CEO, about concerns over MIMA's billing practices. Relator was instructed that the physicians are free to document and bill as they see fit.

15

38.

Notwithstanding the results of the audit, MIMA has continued to perform IMRT on nearly all of its radiation patients, without documenting the patient-specific medical necessity for such procedures. To the contrary, MIMA physicians routinely place in the medical record a pre-printed form entitled "Intensity Modulated Radiotherapy (IMRT) Medical Necessity Note," which merely provides general information about IMRT, rather than discussing the specific condition of the patient at issue.

39.

At a billing conference in 2007, Relator had dinner with Jim Hugh of AMAC, and discussed MIMA's continuing problems. Hugh suggested that AMAC perform another audit, but indicated that he believed MIMA might find itself in trouble with Medicare and was worried that he might be called to testify against MIMA.

40.

Subsequently, Relator called Dr. McClure to express his concerns, and was given the chance to make a PowerPoint presentation addressing his concerns. Present at this meeting were Dr. McClure, MIMA's CEO; Al O'Connell, MIMA's chief administrative officer; and Rich Nesco, MIMA's chief financial administrator. Shortly after this presentation, Relator was given a new boss and was instructed by Al O'Connell not to raise the concerns again or his job would be in jeopardy. Lisa Hutchins took over the position as Director of the MIMA Cancer Center, and Relator remained the Direction of Radiation Oncology.

41.

Recently, MIMA had another chart audit performed by AMAC. The summary for

this audit noted that:

> The national average for IMRT is approximately 25%-30% and while our
> sample was approximately 90% IMRT. We identified cases such as bone and
> brain mets being treated with IMRT. We found one case where IMRT was
> used to treat a single fraction skull met. This is a could be a questionable use
> of IMRT in peer review as the necessity of utilizing IMRT would be difficult
> to document. . . . Our concern is based solely on the observation that
> MIMA's IMRT percentage is substantially higher than the national average
> and may be a factor in future scrutiny from Medicare, the OIG or commercial
> payors.
> . . .
> The standard patient education sheet only discusses IMRT treatment. IMRT
> should not be the standard of care for all patients treated.

42.

Relator estimates that more than $8 million has been paid to MIMA by Medicare

for medically unnecessary IMRT procedures since the opening of the MIMA Cancer

Center.

C.      Improper billing of CPT 77470 – "Special treatment procedure"

43.

In certain cases, physicians performing radiation therapy are required to expend

additional work and effort beyond what would normally be expected.  Under those

circumstances, the physician may obtain additional payment by billing CPT code 77470 –

"Special treatment procedure (eg, total body irradiation, hemibody radiation, per oral,

endocavitary or intraoperative cone irradiation)".  As stated in the ASTRO/ACR Guide to

Radiation Oncology Coding, "[i]n radiotherapy, situations arise where additional

physician and facility work is involved in treating a patient, and then it is appropriate to

report CPT code 77470."  The LMRP for Radiation Special Treatment Procedures states

that "Procedure code 77470 covers the additional physician effort and work required for the special procedures of hyperfractionation, total body irradiation, per oral or transvaginal cone use, brachytherapy, hyperthermia, combination with chemotherapy or other combined modality therapy, stereotactic radiosurgery, intra-operative radiation therapy, and any other special time consuming treatment plan."

44.

However, the use of code 77470 is intended to be the exception, rather than the rule, and it is improper to routinely use the code without specific case-by-case justification. As stated in the ASTRO/ACR Guide to Radiation Oncology Coding, "[t]here is no case in which it is routinely used, and therefore the physician should decide to report CPT code 77470 on a case-by-case basis and document the work effort involved." This Guide also notes that "a special treatment procedure code (CPT code 77470, *Special radiation treatment*) should not be routinely billed with IMRT." Code 77470 also is not intended to be used because a patient has another ongoing medical diagnosis such as diabetes, C.O.P.D. or hypertension.

45.

In order to bill code 77470, the provider must document the medical necessity for such code. As stated in the LMRP for this code:

Documentation maintained in the patient's file must include the following:

- diagnosis of a new neoplasm

- treatment plan for a distinctly separate course of radiation therapy that supports the medical necessity of the use of procedure code 77470

It is expected that documentation will be maintained in the patient's medical record to support the medical necessity for this procedure.

46.

Contrary to the guidelines, MIMA physicians for years have routinely billed code 77470 for nearly every radiation patient they treat. MIMA's philosophy has essentially been than 77470 is a "free" code that may be added to any IMRT treatment in order to increase billings. Moreover, the physicians have failed to provide documentation supporting the use of code 77470.

47.

In its 2005 audit, AMAC specifically addressed this issue, noting that there was no documentation supporting the code in <u>any</u> of the patient charts reviewed:

> Need a separate piece of documentation for code 77470. There are examples in the CD provided. <u>In all cases there was no documentation</u>. This code has historically been billed on the day of the 7726X treatment planning code.
> ...
> There needs to be a separate note to justify special treatment procedure just as you would for any procedure performed.

48.

Notwithstanding these audit results, MIMA has continued to bill code 77470 on all or nearly all of its IMRT patients, without properly documenting the necessity for such code. Typically, the only "documentation" supporting this code is a pre-printed section in the patient record where the physician either checks a box containing a preprinted justification or writes in a short justification for the special treatment procedure. Generally, the only reason given to justify the special treatment procedure is "IMRT," or some similar formulation.

49.

Relator has had several discussions of this issue with MIMA management, and this was one of the subjects discussed by Relator in his PowerPoint presentation to management.

50.

The recent chart audit by AMAC confirmed MIMA's practice of routinely billing code 77470, with comments noting that "this should not be routinely billed with IMRT." Indeed, the comment for one of the patient charts noted that, although IMRT was given as the justification for the 77470, the patient did not even receive IMRT:

> documentation for this code has IMRT plan as a reason for billing the 77470. Patient did not receive IMRT treatment. Recommend an individual note by physician to support this charge rather than a check off list.

51.

Relator estimates that Medicare has paid over $750,000 in unjustified payments under code 77470 since the opening of the MIMA Cancer Center.

D.    Improper billing of CPT 77370 – "Special medical radiation physics consultation"

52.

A qualified medical physicist is a professional who specializes in the application of physics to medicine.   Medical physicists may help develop improved imaging techniques, collaborate with radiation oncologists to design treatment plans, and monitor equipment and procedures to insure that cancer patients receive the prescribed dose of radiation to the correct location.

53.

It is anticipated that a medical physicist will cooperate with the radiation oncologist in preparing a treatment plan for an IMRT patient. In general, the oncologist will assign specific dose requirements and dose constraints, taking into account the tumor volume and location and the surrounding organs. The medical physicist, or a dosimetrist under his supervision, will then use a treatment planning computer to calculate a complex multibeam treatment plan that will deliver the target dose and satisfy the dose constraints. The medical physicist's role under normal circumstances is taken into account in the various payment codes related to IMRT planning.

54.

For example, CPT code 77336 ("continuing medical radiation physics consultation") is used to report

> the ongoing medical physics assessment provided by a medical physicist to each patient receiving radiation therapy. . . . CPT code 77336 . . . involves weekly chart reviews, review and analysis of medical physics aspect of changes to the treatment regime, consultation on patient setup and treatment modifications, verification of dose calculation data, reviewing accuracy of the current data record, including review of patient-specific therapist treatment and technical notes, and patient radiation safety.

Attachment 26, ASTRO/ACR Guide to Radiation Oncology Coding.

55.

In certain circumstances, however, a special problem or circumstance may require the radiation oncologist to request that a qualified medical physicist provide a special consultative report or specific physics service for an individual patient. For example, a patient may have a pacemaker that must be taken into account in developing a treatment plan. In such cases, the physicist will prepare a full consultative report and provide it to

the physician, who acknowledges and relies upon the report in providing care to the

patient. The provider may obtain additional payment for this special consult by using

CPT code 77370, "Special medical radiation physics consultation."

56.

The ASTRO/ACR Guide states that:

> The special medical radiation physics consultation CPT code 77370 is used
> when the complexity of the treatment plan is of such magnitude that a
> thorough analysis is necessary to address a specific problem, or when the
> service to be performed requires the expertise of a qualified medical
> physicist. The clinical indication that justifies the request for the special
> physics consultation should also be documented.
>
> The qualified medical physicist will spend a considerable amount of time and
> effort on behalf of a specific patient and will render a customized written
> report (which will form part of the patient's chart) to the radiation oncologist
> in reference to the problem or service being addressed.
> ...
> Documentation of the physician's request and the physics report, as well as
> the physician review of the report, is necessary. Special physics
> consultations should not be reported when a qualified medical physicist
> verifies the calculations performed by others or performs the duties of other
> members of the treatment team (e.g., dosimetrist).

57.

As noted in the ASTRO/ACR Guide, however, this code may not be used to

obtain additional payment for the physicist's typical role in formulating an IMRT plan:

> Because of the complexity in planning the myriad beamlet portals, each
> varying in intensity, treatment verification must be directly linked to
> implementation for each patient. Verification data will confirm the accuracy
> of the intensity-modulated dose fluence patterns and accurately transfer these
> data to the technical patient setup and dose delivery system. This activity is
> generally accomplished by delivering the plan to a film phantom or other
> detector system capable of rendering information confirming the accuracy of
> the treatment plan to the delivery system. This work is included in IMRT
> planning and cannot be billed as a special physics consult. A special physics
> consult may still be requested and appropriately coded when special
> circumstances require physics input beyond that required for IMRT planning

(e.g., evaluation of dose tolerance and dose delivery to an implanted pacemaker).

58.

Moreover, "Special physics consultations should not be reported when a qualified medical physicist verifies the calculations performed by others or performs the duties of other members of the treatment team (e.g., dosimetrist).").

59.

The ASTRO/ACR Guide gives the following examples of "[s]ome problems that might justify use of CPT code 77370":

> - The complex interrelationships of electron and photon ports and complex dosimetric considerations in brachytherapy, including high-dose rate remote afterloader applications, intravascular brachytherapy treatments and interstitial radioactive seed implantation
>
> - Analysis of customized beam modification devices and special blocking procedures (and their dosimetric evaluation) to protect critical organs during treatment
>
> - Analysis of the effects of previous radiation therapy with assessment of cumulative radiation dose to critical organs
>
> - Computation of dose to the fetus of a pregnant patient undergoing radiation therapy....

These examples illustrate the types of unusual situations that are intended to justify a special physics consult.

60.

Rather than using the code only in special circumstances, however, MIMA has established a policy of billing for a special physics consult for nearly every IMRT patient, regardless of medical necessity. In some cases, the medical record contains no formal request by the oncologist for a special physical consult. In other cases, the request might

simply be a notation in the medical records stating "IMRT: check the fluences physicists!!", "Check the IMRT fluences in a phantom," or similar language. In many cases, the request would be a pre-printed form memorandum to the staff physicist simply requesting that the physicist "devise an IMRT plan."

61.

Generally, the physicist would respond with a preprinted form memorandum certifying that "the dose, energy fluence, and monitor units for the IMRT treatment plan for the above patient are accurate and within satisfactory agreement with the planned criteria," or similar form language. In nearly all such cases, the medical physicist performed nothing beyond his expected function in assisting in the preparation of a treatment plan, and did done nothing that amounted to a "special physics consult."

62.

MIMA's routine use of code 77370 to obtain additional payments for all or nearly all IMRT patients, regardless of the need for a special physics consult, constitutes an intentional abuse of the code. Relator has had several discussions of this issue with MIMA management, and this was one of the subjects discussed by Relator in his PowerPoint presentation to management.

63.

The recent chart audit by AMAC confirmed MIMA's practice of improperly and routinely billing code 77370. The audit summary states:

> All special physics consult reports are documented via a template and are worded exactly the same for all patients. By definition, special physics reports, 77370, are meant to be customized and "special" for each patient's particular case.... It is also noted that almost all patients have a special physics consult performed regardless of the complexity of the treatment regimen. Special Physics Consults should only be performed on patients

24

with special considerations concerning treatment planning and not used as a standard of care.

64.

The comments regarding individual charts also reflect the improper use of code 77370. One comment stated as follows:

special physics consult should not be routinely billed for IMRT patients. This report only encompasses the IMRT plan, QA and routine QA of the accelerator. There is nothing above and beyond the normal treatment for this patient that would require a special physics consult.

65.

Relator estimates that Medicare has paid over $170,000 in unjustified payments under code 77370 since the opening of the MIMA Cancer Center.

E.    Other billing issues.

66.

Although the above practices constitute perhaps its most egregious and routine billing improprieties, MIMA also routinely submits claims that are false for other reasons. Among other things, MIMA:

-- routinely bills IGRT charges in conjunction with stereotactic radiosurgery, CPT code 61793, even though IGRT imaging is bundled into the stereotactic radiosurgery payment and should not be billed separately.

-- routinely bills for procedures under the name of the consulting physician, even though another physician performs the procedure.

-- routinely bills for complex simulations under CPT code 77290, without sufficient documentation to justify the level of complexity, and where the simulation should appropriately be billed as a simple simulation under code 77280.

-- routinely bills electron setups as 3-D simulations under CPT code 77295, when it should almost always be billed under CPT code 77315.

     --      improperly bills for radiation treatment management, CPT code 77427, in conjunction with claims for stereotactic radiosurgery or stereotactic radiotherapy.

     --      routinely bills extra charges under CPT code 77300, basic radiation dosimetry calculation, for most patients, even though this calculation is not performed and there is rarely a written order from the physician or other documentation justifying the charge.

F.    <u>Osler Medical</u>.

### 67.

In 2006, MIMA entered into a business agreement with Osler Medical, a large, multi-specialty medical group in Brevard County, to provide radiation services for Osler's patients. Osler leased one of MIMA's treatment machines, as well as MIMA staff and physicians, to provide such services. MIMA provided Osler with the billing codes to be used to bill for such patients. As a result, in addition to submitting numerous false claims for its own patients, MIMA caused Osler to submit numerous false claims for the reasons discussed herein.

### COUNT I
### FEDERAL FALSE CLAIMS ACT

### 68.

The allegations in the preceding paragraphs are incorporated by reference.

### 69.

Defendant violated the Federal False Claims Act in that it:

(1)     knowingly presented or caused to be presented numerous false claims for payment or approval to the United States in violation of 31 U.S.C. § 3729(a)(1); and

(2)     knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(2).

70.

As a result of Defendant's violations of 31 U.S.C. § 3729, the United States has suffered damages in an amount to be determined at trial.

WHEREFORE, Relator, on behalf of himself, the United States, and the State of Florida, prays:

(a)     That the Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained because of Defendant's actions, plus a civil penalty of between $5,500 and $11,000 for each violation of the federal and state False Claims Acts;

(b)     That Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim if the United States intervenes, and not less than 25 percent nor more than 30 percent of the proceeds of the action or settlement of the claim if the United States does not intervene;

(c)     That Relator be awarded all costs and expenses incurred, including reasonable attorneys' fees; and

(d)     That the Court order such other relief as is appropriate.

Trial by jury is hereby requested.

Respectfully submitted,

James A. Gustino
Florida Bar No. 612499
James A. Gustino, P.A.
P.O. Box 770759
Winter Garden, Florida 34777
(407) 905-8820
(407) 905-9211 (fax)
jgustino@mindspring.com

G. Mark Simpson
Georgia Bar No. 647725
Simpson Law Firm, LLC
165 North Main Street
Jonesboro, GA 30236
(678) 610-1994
(678) 302-8721 (fax)
mark@marksimpsonlaw.com

Michael A. Sullivan
Georgia Bar No. 691431
Finch McCranie, LLP
225 Peachtree St., Suite 1700
Atlanta, Georgia 30303
(404) 658-9070
(404) 688-0649 (fax)
msullivan@finchmccranie.com
Attorneys for Plaintiff-Relator