FILED

UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA *ex rel.*
FRED FANGMAN,

        Plaintiff,

v.

MELBOURNE INTERNAL MEDICINE
ASSOCIATES, P.A. and TODD J.
SCARBROUGH, M.D.

        Defendants.

Case No. 6:08-cv-1095-Orl-31DAB
JUDGE GREGORY A. PRESNELL

## UNITED STATES' COMPLAINT

The United States brings this action to recover losses from false claims

submitted to the government as a result of the sustained fraudulent course of conduct

of the defendants, Melbourne Internal Medicine Associates, P.A. ("MIMA") and Todd J.

Scarbrough, M.D. ("Scarbrough") (collectively "defendants"). MIMA is a physician-

owned medical practice that includes several primary care and specialist physician

practices. One of the specialist facilities, the MIMA Cancer Center ("MCC"), defrauded

Medicare and TRICARE ("Federal Health Care Programs") through various schemes

designed to improperly inflate the claims that MIMA submitted on behalf of MCC to

Medicare. In his capacity as the Medical Director at MCC and a practicing radiation

oncologist, Scarbrough knew that several of MCC's billing practices were improper but

instituted schemes specifically intended to cloak MCC's fraud or, at a minimum, appear

compliant when, in fact, the practice was a sham. Executives at MIMA had knowledge

of a substantial number of the fraudulent billing practices at MCC. MCC also caused

5-18

another medical practice, Osler Medical ("OM"), to submit false claims as a result of services purportedly rendered by MCC physicians.  By knowingly and actively billing for services improperly or never rendered, defendants submitted and caused false claims to be submitted to Federal Health Care Programs in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*

I.    **NATURE OF ACTION**

1.    The United States brings this action to recover treble damages and civil penalties under the FCA, 31 U.S.C. § 3729 *et seq.* and to recover damages and other monetary relief under the common law or equitable theory of unjust enrichment.

2.    The United States bases its claims on defendants causing the submission of false or fraudulent claims to Federal Health Care Programs and making or using false statements material to false or fraudulent claims paid by the United States.

3.    Within the time frames detailed below, Scarbrough devised, implemented, and sought to sustain numerous fraudulent billing practices at MCC that improperly inflated claims submitted by MIMA to Federal Health Care Programs.

4.    The claims at issue in this action are false because defendants submitted claims for certain codes without providing the necessary supervision, rendering the service billed, including but not limited to drafting the necessary documentation to support the code, and/or for duplicative and unnecessary services for the specific purpose of increasing the amount of reimbursement.  In short, defendants billed codes

2

that were not supported by the physicians' work or documentation in the patients' medical records.

5.      Defendants submitted claims for these codes in contravention of the Federal Health Care Programs' coding rules despite repeated reprimands by their auditor and billing employees that their billing practices were improper.

6.      Defendants knew that their fraudulent billing practice would result in the submission of thousands of false or fraudulent claims to Federal Health Care Programs in excess of their entitlement.  Defendants submitted these fraudulent claims with actual knowledge that they were false, or acting in reckless disregard or with deliberate ignorance of their truth or falsity.

## II.    JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and supplemental jurisdiction to entertain common law or equitable claims pursuant to 28 U.S.C. § 1367(a).

8.      This Court may exercise personal jurisdiction over defendants pursuant to 31 U.S.C. § 3732(a) and because defendants transact business in the Middle District of Florida, and caused the submission of false or fraudulent claims in this District.

9.      Venue is proper in the Middle District of Florida under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because defendants have transacted business in this District.

## III.   PARTIES

10.    The United States brings this action on behalf of the Department of Health and Human Services ("HHS"); the Centers for Medicare & Medicaid Services ("CMS") (formerly known as the Health Care Financing Administration), which administers the Medicare program; and the Department of Defense, which administers the TRICARE/CHAMPUS program ("TRICARE").

11.    Relator Fred Fangman ("Fangman") is a resident of Florida and the former director of radiation oncology at MCC.  In July 2008, Fangman filed an action alleging violations of the FCA on behalf of himself and the United States Government pursuant to the *qui tam* provisions of the FCA, 31 U.S.C. § 3730(b)(1).

12.    Defendant MIMA is a physician owned medical practice in Brevard County, Florida organized under the laws of Florida.  MCC is one office within the medical practice that submits its Medicare claims through MIMA's provider number.

13.    Defendant Scarbrough is the Medical Director of MCC, who has been practicing as a radiation oncologist at MCC since its inception.  Nanalei Golden, M.D., ("Golden") is the other radiation oncologist who has practiced at MCC for a majority of the time that the facility has been open.

## IV.   THE LAW

14.    The FCA, 31 U.S.C. §§ 3729-33, provides for the award of treble damages and civil penalties for, *inter alia*, knowingly causing the submission of false or fraudulent claims for payment to the United States Government and for making or using

4

false statements material to false or fraudulent claims paid by the United States.

31 U.S.C. §§ 3729(a)(1), (2); 31 U.S.C. §§ 3729(a)(1)(B) (May 2009).[1]

15.    The pre-FERA FCA provides, in pertinent part, that:

> (a) Any person who (1) knowingly presents, or causes to be presented, to
> an officer or employee of the United States Government or a member of
> the Armed Forces of the United States a false or fraudulent claim for
> payment or approval; (2) knowingly makes, uses, or causes to be made or
> used, a false record or statement to get a false or fraudulent claim paid or
> approved by the Government

* * *

> is liable to the United States Government for a civil penalty
> of not less than $5,000 and not more than $10,000, plus 3
> times the amount of damages which the Government
> sustains because of the act of that person . . . .

> (b) For purposes of this section, the terms "knowing" and
> "knowingly" mean that a person, with respect to information
> (1) has actual knowledge of the information; (2) acts in
> deliberate ignorance of the truth or falsity of the information;
> or (3) acts in reckless disregard of the truth or falsity of the

---

[1] The FCA was recently amended pursuant to Public Law 111-21, the Fraud
Enforcement and Recovery Act of 2009 (FERA), enacted May 20, 2009. Although §
3729(a) was amended in its entirety, only § 3729(a)(2), which FERA renumbered as §
3729(a)(1)(B), can be applied retroactively back to and including June 7, 2008 by virtue
of § 4(f) of FERA. "The amendments made by this section shall take effect on the date
of enactment of the Act and shall apply to conduct on or after the date of enactment,
except that (1) subparagraph (B) of section 3729(a)(1), as added by subsection (a)(1),
shall take effect as if enacted on June 7, 2008, and apply to all claims under the False
Claims Act (31 U.S.C. § 3729 *et seq.*) that are pending on or after that date . . . ."
FERA, § 4(f). Because the conduct in this Complaint is alleged to have occurred from
approximately 2003 through at least 2008, this Complaint will predominantly reference
the pre-FERA numbering for paragraphs 3729(a) of the FCA with the limited exception
of referencing the post-FERA numbering, pursuant to § 4(f), for conduct on or after
June 7, 2008 when defendants "knowingly make, use, or cause to be made or used, a
false record or statement material to a false or fraudulent claim . . . ." 31 U.S.C. §
3729(a)(1)(B).

> information, and no proof of specific intent to defraud is
> required.

31 U.S.C. § 3729.

16.     The post-FERA FCA was modified to reflect the below pertinent revisions:

> (a) (1) any person who – (B) knowingly makes, uses, or causes to be
> made or used, a false record or statement material to a false or fraudulent
> claim . . .

* * *

> (b) For purposes of this section, (1) the terms "knowing" and
> "knowingly" – (A) mean that a person, with respect to
> information – (i) has actual knowledge of the information; (ii)
> acts in deliberate ignorance of the truth or falsity of the
> information; or (iii) acts in reckless disregard of the truth or
> falsity of the information; and (B) require no proof of specific
> intent to defraud . . . . .

31 U.S.C. § 3729 (May 2009).

17.     The standard of proof under the FCA is preponderance of the evidence.

31 U.S.C. § 3731(c).

## V.     THE FEDERAL HEALTH CARE PROGRAMS

## A.     Medicare Part B

18.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as

the Medicare program, to pay for the costs of certain healthcare services and items.  42

U.S.C. §§ 1395 *et seq.*  HHS is responsible for the administration and supervision of

the Medicare program.  CMS is an agency of HHS and directly administers the

Medicare program.  The Medicare program has several parts, including Medicare Part

6

B ("Supplementary Medical Insurance for Aged and Disabled").  42 U.S.C. § 1395k; 42 C.F.R. § 410.10.

19.    The Medicare Part B program is a 100% federally subsidized health insurance system for eligible persons aged 65 and older and persons with qualifying disabilities, who may enroll in the program to obtain benefits in return for payments of monthly premiums as established by HHS.  The benefits covered by the Medicare Part B program include medical treatment and services by physicians under 42 U.S.C. §1395k(a)(2)(B).

20.    The United States provides reimbursement for Medicare claims from the Medicare Trust Fund through CMS.  To assist in the administration of Part B of the Medicare Program, CMS contracts with "carriers." 42 U.S.C. §1395u.  Carriers, typically insurance companies, are responsible for processing the payment of Part B claims to providers on behalf of CMS.  *Id.*  First Coast Service Options, Inc. ("First Coast") is the carrier responsible for processing the payment of Part B claims to MIMA on behalf of CMS.

21.    At all relevant times herein, MIMA knowingly submitted and caused false claims to be submitted to Medicare through its contractor, First Coast.

**B.    The Medicare Provider Agreement**

22.    Florida providers claim Medicare Part B reimbursement from First Coast pursuant to written provider agreements.  First Coast receives, processes, and pays or rejects those claims according to Medicare rules, regulations and procedures.

23.     MIMA signed or caused to be executed provider agreements with Medicare that permitted MIMA to submit claims and accept payment for services provided by MCC physicians.

24.     Medicare assigns each participating provider a unique billing Provider Identification Number ("PIN"). MCC submits its Medicare claims through MIMA, which uses a group provider number for all of its offices. MCC physicians submitted an enrollment form to permit them to electronically submit the CMS 1500 through MIMA to the carrier, First Coast.

25.     A physician who treats a Medicare patient is required to submit an electronic or hard-copy Medicare Health Insurance Claim Form ("HCFA form 1500") to the carrier, who on behalf of CMS, pays for a portion of the claim. In submitting Medicare claim forms, providers must certify that the information included on the form presents an accurate description of the services rendered and that the services were medically necessary.

26.     In particular, MCC physicians certified to the following language on the CMS 1500 enrollment form that they submitted to Medicare: "I certify that the services shown on this form were medically indicated and necessary for the health of the patient . . . ." Scarbrough certified to this language when MCC was first established in the "reassignment of benefits statement" submitted to Medicare on or about April 2003 that stated, "[y]our employment or contract with this individual or provider/supplier must be in compliance with CMS regulations."

8

27.    By participating in the computerized billing of Medicare claims, MCC physicians agreed to submit claims through MIMA using HCFA form 1500 and were aware of the required certifications.

**C.    The TRICARE Program**

28.    TRICARE, formerly known as CHAMPUS, is a federal health benefits program, established by 10 U.S.C. §§ 1071-1110, that offers a triple option benefit plan: an HMO option; a PPO option; and a fee for service option.  TRICARE/CHAMPUS is administered by the Secretary of Defense.  TRICARE/CHAMPUS provides health care benefits to eligible beneficiaries, which include, among others, active duty service members, retired service members, and their dependents.

29.    The regulatory authority establishing the TRICARE/CHAMPUS program provides reimbursement to individual health care providers applying the same reimbursement scheme and coding parameters that the Medicare program applies.  10 U.S.C. §§ 1079(j)(2)(institutional providers), (h)(1)(individual health care professional)(citing 42 U.S.C. 1395, *et seq.*).  Services and supplies that are not medically or psychologically necessary for the diagnosis or treatment of a covered illness or injury are specifically excluded from coverage.  32 C.F.R. § 199.4(g)(1).

30.    TRICARE/CHAMPUS prohibits improper billing practices such as unbundling, fragmenting, code gaming, and duplicate billing as a means of manipulating CPT codes to increase reimbursement.  32 C.F.R. §§ 199.9(c).  Such practices are considered fraudulent and abusive and a misrepresentation of services.  32 C.F.R. §§ 199.9(c)(5) - (c)(8).

9

## D.   Medical Coding

31.   The American Medical Association assigns and publishes numeric codes, known as Current Procedural Terminology (CPT) and Health Care Financing Administration Procedure Coding System (HCPCS) codes.  The codes are a systematic listing of procedures and services performed by health care providers.  They include codes for radiation oncology and related services, based on complexity, supervision, and documentation requirements.  Health care providers and health care benefit programs use CPT and HCPCS codes to describe and evaluate the services for which they claim, and to decide whether to issue or deny payment.  Each health care benefit program establishes a fee reimbursement for each procedure described by a CPT or HCPCS code.

32.   Each year Medicare publishes a Physician's Fee Schedule in which all of the CPT codes are listed, together with the reimbursement Medicare allows for each code.  Medicare lists the amount of reimbursement paid in the facility setting (i.e., hospital) and the non-facility setting (i.e., office).

33.   As a condition of participation in the Medicare Part B program, providers agree to be familiar with, and abide by, the program's reimbursement policies.  In particular, MIMA on behalf of MCC certified to the following requirements in July 2003 when MCC first applied for Medicare enrollment:

> (3)   I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier.  The Medicare laws, regulations, and program instructions are available through the Medicare contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying

10

transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

(5)   I agree that any existing or future overpayment made to the supplier by the Medicare program may be recouped by Medicare through the withholding of future payments.

(6)   **I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.**

(emphasis added).

34.   Accordingly, MCC had a duty to be knowledgeable of the statutes, regulations, and guidelines regarding coverage for Medicare services, which include the policies relevant to radiation oncology and related services.

35.   MCC physicians, including Scarbrough, certified that they were knowledgeable of Medicare's requirements in provider enrollment forms submitted.

36.   Medicare covers, and participating providers agree to submit claims, only for services that are medically necessary to diagnose and treat illness or injury, and for which the provider maintains adequate supporting documentation, for example, physician's orders, medical necessity notes, and other pertinent documentation justifying the treatment administered. 42 U.S.C. §1395y(a)(1)(A). A physician may not be reimbursed by Medicare for medically unnecessary services.

37.   Absent certain exceptions, Medicare Part B does not cover, and providers agree not to submit claims, for services provided that are not necessary, not appropriately administered, or improperly documented.

11

38.     In short, in order for defendants to be properly reimbursed for patient care by the Medicare program, CMS requires that the treating physician order the applicable services, appropriately document the justification and administration of those services, submit only those codes that correlate with the notes made by the physician in the medical record, and that the physicians adhere to coding guidelines when assigning applicable codes.

## VI.     THE IMPROPER CONDUCT OF DEFENDANTS

39.     Since August 2003 through at least 2008, defendants defrauded the United States by knowingly submitting and knowingly causing false or fraudulent claims for improper and unjustifiable radiation oncology services to be submitted to Federal Health Care Programs.

40.     For the relevant time periods, defendants engaged in a pattern and practice of submitting false claims for payment to Federal Health Care Programs.  This damaged the United States by causing it to pay more to defendants than the amounts to which they were actually entitled.

41.     Through the use of templates, written and verbal directives, and billing practices designed and/or supported by Scarbrough, defendants routinely billed for services without providing the necessary supervision, rendering the service billed, or including the necessary documentation to support the code.

42.     The Federal Healthcare Programs paid out millions of dollars to defendants that should not have been paid.

12

43.    At MCC, patients can be administered several different types of radiation treatment contingent on the complexity and location of the tumor.  Treatment plans require a detailed evaluation of the tumor and the patient's anatomy.  Accordingly, the codes affiliated with radiation oncology require detailed documentation and specific physician supervision.

44.    Despite the relevant codes' explicit parameters, defendants knowingly failed to properly administer the services for the specific purpose of increasing their billings in violation of Medicare guidelines.

45.    Scarbrough sought to hide this fraudulent practice, in the event that "Medicare walks into our office," through meaningless templates and carefully crafted protocol.

46.    Despite these efforts to cover-up the fraud, defendants' independent auditor, American Medical Accounting and Consulting ("AMAC") and MIMA's own billing and coding employees, cited these fraudulent billing practices every year that an audit was conducted.  Despite consistent reprimands to cease these improper billing practices, defendants continued to improperly bill these codes when submitting claims to Federal Health Care Programs.

A.    **Defendants Failed to Supervise Radiation Treatment and Patient Care.**

47.    The administration of radiation therapy requires specific supervision. Failure to render that supervisory care makes such services non-reimburseable.

13

48. In three separate areas, defendants failed to supervise the placement and administration of radiation treatment.

49. First, defendants administered image-guided radiation therapy (IGRT) without the required level of physician supervision.

50. IGRT allows physicians to more precisely target the delivery of radiation to affected areas and only became eligible for Medicare reimbursement in 2006. At the time these services were rendered, the Current Procedural Terminology (CPT) code for IGRT, CPT 77421, requires personal supervision, which means the "physician must be in attendance in the room during the performance of the procedure." 42 CFR §410.32(b)(3)(iii). The mandated physician supervision requirement allows the physician to make a real-time correction to the imaging device prior to treatment.

51. CMS requires specific documentation in the patient's record, corroborating the administration of the appropriate physician supervision. "Services that are not performed under the appropriate supervision are not considered reasonable and necessary and, therefore, are not covered under Medicare."   *See* Medicare Part B Reference Manual, Appendix L.

52. From 2006 through 2007, defendants disregarded this supervision requirement and only reviewed the IGRT images *after* the treatment had been administered or not at all.

53. In an email from a coding specialist sent on May 9, 2006, it was clear that "[t]he professional component is for *the physician involvement in real time correction that takes place prior to treatment delivery*." Exhibit A (emphasis

14

added).  Acknowledging the required real time physician review, Scarbrough decided to

take his chances on being audited and continue to bill IGRT in derogation of the

supervision requirement.

54.     It was only over a year later that Scarbrough openly acknowledged MCC's

noncompliance in the administration of IGRT stating *"we are not legal per se at*

*present as we are not CMS-compliant*, and the financial penalties of CMS-non-

compliance are bigger than HIPAA-non-compliance." Exhibit B (emphasis added).

55.     Even before that date, the Coding Department Supervisor for all MIMA

facilities acknowledged this falsity in IGRT billing in a May 1, 2007 email stating that:

> *you hardly cannot tell at all where there is physician involvement.*
> *There are also issues where the physician is not present when we*
> *are doing things that require direct physician supervision, meaning*
> *they have to be in the room.* These are a few examples of the major
> issues.

Exhibit C (emphasis added).

56.     AMAC, likewise, reprimanded this practice in 2007 stating:

> There is "NO" physician review in real time prior to the treatment on any
> patients. *We advise the center to immediately cease the billing of this*
> *code until a system is developed to record the physician involvement*
> *in the shifts prior to treatment*.

Exhibit D (emphasis added).

57.     Defendants continued to bill for this code, and, instead, in an attempt to at

least appear CMS-compliant, Scarbrough created a system, utilizing hand-held devices,

that provided the illusion of real-time physician supervision of IGRT.  Scarbrough

described in an email dated August 13, 2007, "[w]e need this in the event of (my new

favorite saying): Medicare walks into our office." Exhibit E.

58.    On its face, a hand-held device does not satisfy the explicit requirement of being in the room where the procedure is administered. Even accepting its use, however, MCC physicians' devices were programmed with an almost instantaneous auto-response that read, in some instances, "[i]mages received for 'real time' review. Proceed according to policy." Upon receipt of the auto-response, MCC radiation therapists confirmed that they were instructed to proceed with the radiation treatment. The system, as designed, did not even allow for physician supervision prior to the administration of treatment.

59.    Instead, a copy of this standard auto-response, together with the images, were printed and placed on the physician's desk for his or her signature after the administration of the radiation treatment.

60.    More to the point, defendants never intended to supervise the administration of this complex imaging device as required by Medicare. Based on records received from AT&T that services these hand-held devices, there were no images received by Scarbrough's hand-held device or reviewed for one month, and in other months the kilobyte data transfer was so minimal there could never have been the daily receipt and review of the hundreds of images that were indicated as billed during those months.

61.    Nor were defendants available to make a real-time correction to the device prior to treatment. During dates when Scarbrough was traveling in Cancun and Seoul, MIMA submitted at least 62 claims that included the furnishing of IGRT services

16

under his name.  Similarly, in 2006 through 2008, Golden traveled to Hong Kong,
Athens, Rome, and Quito, submitting at least 144 claims that included IGRT services
during those dates.  MIMA was paid on these claims.

62.     Notwithstanding the hundreds of instances when it was questionable
whether the defendants reviewed the images in real time, there were several instances
when the service was non-billable because the service was never rendered.  In those
instances, the patient records failed to reflect a physician signature on the IGRT
images, which would mean the image was never reviewed, and sometimes, there was
no evidence that an image was even taken despite defendants' consistent practice of
billing for the service.

63.     Defendants' failure to supervise the administration of IGRT despite
knowledge of their noncompliance resulted in the submission of false claims to Federal
Health Care Programs.

64.     Second, defendants often administered intensity modulated radiation
therapy (IMRT), CPT 77418, when no radiation oncologist was on-site at the treatment
facility.

65.     IMRT differs from conventional therapy in that it shapes radiation beams
to closely approximate the size of the tumor being treated.  The intensity of the radiation
in IMRT can be changed during treatment to spare more adjoining normal tissue than
during conventional radiation therapy.  Accordingly, the professional and technical
billing of IMRT requires direct supervision – "physician must be present in the office

17

suite and immediately available to furnish assistance and direction throughout the

performance of the procedure." *See* 42 C.F.R. §410.32(b)(3)(ii).

66.     It was not until 2007 – three years after MCC had been operating – that

MCC modified its policies and procedures manual to recognize this direct supervision

requirement.

67.     That change appeared to be motivated by both Dr. Joseph McClure, the

President and Chief Executive Officer at MIMA, and AMAC's audit conclusions.  In

particular, Dr. McClure warned that:

> Lady and Gentlemen: I've heard a rumor, perhaps a wisp of a rumor, that
> a theory is circulating that there is a way out of the rule that physicians
> need to be present when Medicare services are being rendered.  This is
> one of those situations in which life may not be as we wish it, but there is
> ample documentation, specific to radiation oncology, that allows no
> maneuvering room.  There are now three of you and there's just no way
> out of us having someone present whenever Medicare patients are being
> treated.  I'm not proposing a debate on the topic.

Exhibit F.

68.     While defendants modified their policies in 2007, the actual practice of

supervising IMRT did not change until January 2009 -- after the United States served a

subpoena *duces tecum* on defendants.

69.     As a result of defendants' failure to supervise radiation treatment and

patient care, defendants submitted false claims to Federal Health Care Programs.

70.     Third, from 2007 through early 2008, Scarbrough sought to automatically

bill an on-treatment visit under CPT Code 77427 every week for every patient,

irrespective of whether he actually saw the patient, rendered any services for the patient, or included the appropriate documentation in the patient's file.

71.     During an on-treatment visit or follow-up care in radiation therapy, a treating physician is required to notate an "assessment of the patient's response to treatment, coordination of care and treatment, review of imaging and/or lab test results," in addition to several other coding requirements.  While the nurses document the vital signs of the patient, the physician is expected, at a minimum, to visit with the patient, dictate or notate a subjective and objective evaluation of the patient, and review certain aspects of the patient's record such as the port films prior to the next radiation treatment.

72.     As confirmed in its policies and procedures manual, MCC knew of this required physician component.  "A summary of this evaluation as well as orders to continue, discontinue, or place treatment on hold must be documented in the patient's chart *by the physician*."  Exhibit G.

73.     Despite this knowledge, Scarbrough instructed the coders to bill for this automatically even though he openly admitted that on a few occasions due to re-scheduling, he would ultimately never see the patient.  MIMA knew about and concurred with Scarbrough's desire to consistently bill on-treatment visits, irrespective of physician involvement.  To mask this noncompliance, Scarbrough would simply sign the nurse's notation about the on-treatment visit without any documentation of his own evaluation of the patient.

74.     In the audit reports received and reviewed by defendants, AMAC consistently flagged the absence of necessary physician-specific notations in the on-treatment visit notes from 2004 through 2007.

75.     This practice of automatically billing for services irrespective of whether the physician reviewed or supervised the service was pervasive throughout the course of a patient's treatment plan.

76.     Scarbrough's failure to supervise these on-treatment visits and complete disregard of appropriate documentation despite repeated insistence on changing the practice caused defendants to submit false claims to Medicare.

**B.      Defendants Double-Billed for Services that Were Not Supported or Otherwise Duplicative of Services Already Rendered.**

77.     At every stage of the radiation therapy treatment process, defendants sought to improperly charge for services that were not supported or otherwise duplicative of services already rendered.  The customary practice of excessive and fraudulent billing was so prevalent that it became common practice at defendants' facility.

78.     Defendants would bill for immobilization devices when the device was never used on the patient or the documentation did not support that a device, as billed, was even used.  Immobilization devices, also known as complex treatment devices (CPT 77332 - 77334), are customized devices that ensure that the radiation irradiates the appropriate part of the body.  Immobilization devices are custom designed and are often made out of plastic or polycarbonate combinations.

20

79.     Claims for immobilization devices were billed to and paid by the Federal Health Care Programs when it either appeared that no services were provided or the physician furnished a lesser service. In one instance, defendants billed a common medical supply, gauze, as an immobilization device and, in an attempt to even further inflate the Medicare reimbursement, defendants billed for two devices because two pieces of gauze were used.

80.     In other instances, defendants would bill for two devices when only one device was necessary – a practice admonished by defendants' auditor in 2007.

81.     This practice of double-billing extended into the actual administration of radiation therapy. IGRT can be administered through the use of stereoscopic guidance, CPT 77421, or port films, CPT 77417; both techniques independently perform the same service. As a matter of course, defendants would order both stereoscopic guidance and port films, which, in effect, is billing twice for the same service.

82.     Defendants also billed special physics consults on nearly every patient, irrespective of medical necessity or proper documentation. A special physics consult, CPT 77370, is only appropriate when the complexity of the treatment plan is of such magnitude that a thorough analysis is necessary to address a specific problem or when the service to be performed requires the expertise of a qualified medical physicist. A justifiable separate and special service must be rendered in order to properly bill for a special physics consult.

83.     Here, the only justification proffered for ordering these special physics consults was the performance of work affiliated with IMRT plans. An IMRT plan cannot

21

alone form the basis for a special radiation consult because all IMRT planning is bundled within the appropriate IMRT code CPT 77301. Defendants unbundled all services affiliated with IMRT to tack on claims and additional reimbursement for special physics consults.

84.    Defendants even went so far as to bill for these affiliated services on different dates to avoid detection of their fraudulent practice. CMS issues updates to its medical coding guidelines (CPT) that are known as Correct Coding Initiative edits or CCI edits to control improper coding practices. In 2008, CMS prohibited payment for the following codes affiliated with IMRT planning on the same date as when an IMRT plan, CPT 77301, was reported because the following codes necessarily encompass the same services captured in CPT 77301. The codes listed included CPT 77014, 77280-77295, 77305-77321, 77331, 77336, and 77370.

85.    In several instances, defendants were careful to bill for these services on different dates from when the IMRT plan was being done despite records that demonstrate that the work was done on the same date of service. This billing practice was executed for the sole purpose of increasing reimbursement affiliated with IMRT planning without being blocked from double-billing due to the CCI edit.

86.    Defendants were well aware of the impropriety of this practice and were repeatedly reprimanded by their own auditor. In most instances, the work affiliated with a special physics consult had already been done under the IMRT plan and no separate or special service was rendered.

87.     When a physician orders a special physics consult, however, the

physicist must prepare a detailed written report explaining the special service rendered

and specific medical necessity justification.  Recognizing the impropriety of this

practice, MCC would purposefully place generic medical necessity notes in each file

that simply reiterated the services already rendered when planning and administering

IMRT.  The note was the same in every file for particular time periods.

88.     When this practice was questioned by the MCC coding specialist, MCC

Chief Medical Physicist Joseph Ting responded, stating that:

> I looked into the mirror in the bathroom and I did not see a policeman
> uniform on me.  And, if I am not mistaken, I did not see a policewoman
> uniform on you, this morning.  So, because we are not the billing police or
> the enforcer, I vote for [sic] just submit those charges per physician's
> requests and go on with our lives (or retirement lives).  I do not see
> anyway around this matter (without the direct support form [sic] MIMA
> administrations [sic]).

Exhibit H.

89.     Defendants were well aware of the inappropriate documentation used to

justify these services as MIMA's Coding Department Supervisor, stated in May, 2007,

"[t]o address some other related issues, there is a definite lack of documentation in

some instances.  There is an over use of 'canned text'. . . ."  Exhibit C.  In fact, because

these reports repeated work already done, there were instances when there was no

record that the physician even reviewed the service, defeating any "special" reason for

ordering the service except to maximize the money made on every patient.

90.     Defendants similarly billed for a brachytherapy charge known as a volume

study, CPT 76873, when it was both medically unnecessary and duplicative of an

23

ultrasound guidance service, CPT 76942, that was already billed.  Both codes facilitate

planning the treatment protocol for prostate patients.  Billing both codes for the same

patient on the same date of service is duplicative and fraudulent.

91.    Throughout the course of radiation therapy, defendants submitted false

claims for patient services to Federal Health Care Programs during the initial simulation,

during the treatment planning stages, and in the actual implementation of the radiation

treatment plans.

**C.    Defendants Billed for Services Not Rendered.**

92.    There were numerous instances when defendants would bill for services

without evidence that the service had been rendered.

93.    Defendants would bill for a tandem and ovoid procedure, CPT 57155,

which required dilation of the cervix and is used in the course of gynecological cancers,

when the record demonstrated that defendants were only inserting a vaginal cylinder or

brachytherapy device used to carry the radiation device.  Because a vaginal cylinder is

not a reimburseable service, defendants sought to get paid for something never done

by submitting claims for the tandem and ovoid procedure.

94.    Defendants also excessively billed for complex simulations, CPT 77290,

even when the documentation failed to indicate what made the treatment area complex.

95.    If a treatment area was complex and, accordingly, required a complex

simulation, the patient's record should document the multiple areas to treat.

Defendants would consistently bill a procedure known as a verification simulation,

24

sometimes done two or three times during one course of radiation treatment, as a complex simulation.

96.     A verification simulation should be billed as a simple simulation because it only requires the radiation therapist to re-image the patient's initial position for verification purposes and is not intended as an assignment of new treatment areas. It is not necessary, nor appropriate, to bill a verification simulation as complex. Defendants' common practice of billing complex simulations multiple times throughout the course of treatment was unsupported and excessive.

97.     Defendants knew that this practice was excessive, and, in several instances, the physicians failed to review the simulations until after the radiation treatment had already been administered, rendering the purpose of the simulation moot. In some instances, the simulations were not approved until days or months later.

98.     In certain highly complex instances, a three dimensional (3D) simulation, billed under CPT 77295, can be run to provide a 3D reconstruction of the tumor volume and surrounding critical normal tissue structures. The use of the 3D simulation is reserved for specific complex instances and is appropriately reimbursed at 400 percent of a simple simulation.

99.     Defendants would bill for a 3D simulation when they failed to do the work required to qualify for reimbursement under the code. Namely, defendants failed to account for tumor volume – one of the primary services affiliated with the code.

100.     AMAC highlighted this improper billing practice in 2004, and again, three years later in 2007.

25

101.    Defendants consistently billed for an additional dosimetry calculation, CPT 77300, when such calculation was inherent in the planning process.  Documentation was a routine form similar to what was used to justify CPT 77370 consults that was neither unique to the patient nor different in outcome.  Dosimetry calculations are intended to facilitate the administration of radiation therapy by assessing dosages that are more or less appropriate for different areas of the body.  Despite the fact that the actual calculation for every patient would be different, the note justifying its use reflected identical outcomes for every patient.  Instead, the additional dosimetry calculation was an automatic step for every patient that was not intended to actually be used in the treatment planning but was purely intended to inflate Federal Health Care Program reimbursement.

102.    Defendants knowingly submitted or knowingly caused to be submitted false claims for tandem and ovoid procedures, complex and 3D simulations, and dosimetry calculations.  Even if the services had been rendered, they would not have been medically necessary or reasonable in these cases.

103.    These pervasive and recurrent improper billing practices were implemented and sustained in Scarbrough's own practice and eventually adopted throughout the administration of radiology oncology services at MCC.

**D.     Defendants Upcoded Radiation Treatments.**

104.    Defendants consistently upcoded cancer treatments to allow for greater reimbursement from Federal Health Care Programs and to take full advantage of the profit maximization potential in all aspects of a patient's treatment plan.

26

105.   In the course of planning and administering treatment plans, defendants would consistently bill IMRT plans on a majority of patients treated despite explicit advisement from both their coding officials and auditor that such a pervasive practice was improper.

106.   IMRT is a sophisticated radiation treatment plan only indicated for very specific types of cancer where extremely high precision is required to spare surrounding organs and must be accompanied by specific medical necessity documentation. *See* Florida CMS Provider, First Coast Service Options, Local Coverage Determination (LCD) for Intensity Modulated Radiation Therapy (IMRT) (L5699). The Florida LCD issued by the CMS carrier, First Coast, provides guidance for the electronic submission and payment of claims. The Florida LCD is intended to state, at a minimum, the specifications a provider must satisfy in order to qualify for a reimbursement.

107.   The Florida LCD for IMRT states in relevant part:

> IMRT is not replacement therapy for conventional radiation therapy methods. Medicare will consider IMRT reasonable and necessary in instances where sparing the surrounding normal tissue is essential and the patient has at least one of the following conditions . . . .
>
> ***
>
> Medical record documentation maintained by the provider must indicate the medical necessity for IMRT, and include all of the following:
>
> 1. The prescription must define the goals and requirements of the treatment plan, including the specific dose constraints for the target(s) and nearby critical structures.
>
> 2. A statement by the treating physician documenting the special need for performing IMRT on the patient in question, rather than performing conventional or three-dimensional treatment planning and delivery. The

27

physician must address the other organs at risk and/or adjacent critical structures.

3.   Signed IMRT inverse plan that meets prescribed dose constraints for the PTV and surrounding normal tissue using a treatment delivery technique to produce the various intensity maps required.

108.   IMRT is not replacement therapy for conventional radiation therapy because where such high precision is not required, conventional radiation therapy may achieve the same or better results at a significantly lower cost.

109.   Although defendants were aware of the specific limitations when administering and billing IMRT, they chose to consistently upcode patient's radiation therapy to IMRT methods, and, in several instances, defendants failed to perform the work required for reimbursement.  In every audit, AMAC counseled defendants that IMRT should not be the standard of care for all patients treated.

110.   In numerous instances, defendants failed to appropriately plan and perform IMRT pursuant to the explicit guidelines stipulated in CPT 77301 and 77418 and the Florida LCD.  For instance, a critical component of IMRT planning includes the evaluation of dose constraints to normal tissues, organs, and the targeted area.  In fact, IMRT cannot be appropriately administered without documentation of the dose constraints because the purpose of IMRT is to spare radiation to the surrounding normal tissue.  Here, there were numerous instances where there was no record of dose constraints.

111.   Defendants' attempt to improperly bill IMRT on a majority of the patients was compounded by their attempt to take advantage of an administrative change in the

Florida LCD.

112.    As referenced *supra* pages 7-8, providers bill services to Medicare using claim forms or HCFA forms.  In order to ensure that physicians do not bill for unnecessary services, Medicare sometimes requires that each physician list on the HCFA form the patient's disease, condition or symptom for each service the physician performs.  The patient's condition, disease or symptom is represented by a number.  The number is derived from a book called the International Classification of Diseases, 9th Revision, Code Manual, or "ICD-9" for short.

113.    Medicare analyzes whether the disease or symptoms warrant the test or procedures billed, as Medicare has found that some providers bill for services which were not medically necessary in order to illegally maximize reimbursement.

114.    In 2007, the Florida LCD was amended to delete the ICD-9 codes, which identify the specific type of cancer being treated with the service, from the claims submitted for IMRT.  The change was purely administrative in nature and did not affect what IMRT was specifically indicated for.  Scarbrough saw this change as a way to upcode billing to IMRT on a majority of his patients.

115.    In an email to MIMA executives, the MIMA Coding Department Supervisor highlighted her concerns with Scarbrough's blasé attitude explaining that:

> [t]he rest of the verbiage in the LCD is the same so I do not understand where it is that Dr. Scarbrough feels that it is now a "free for all" to submit whatever Dx codes we would like to.  This is a very risky step to take in my opinion.  We must all adhere to the guidelines set forth by these LCD's to keep us compliant, they are a very important tool for us.

Exhibit C.

29

116.    To avoid detection of this fraudulent practice, defendants created meaningless notes to justify the more expensive treatment plans. Each note mimicked the CPT coding guidance but was never patient specific. The note was simply verbatim what the coding guidance already stated with no documentation of the "special need" for service.

117.    Defendants failed to appropriately document in the medical record why it was appropriate to use IMRT in a majority of its patients' records, as specifically required by the Florida LCD. Scarbrough created a verbatim medical necessity note that would be placed in each file in the event of an audit. Such a note that is identical for every patient does not satisfy the specific documentation requirements in the Florida LCD.

118.    In some instances, defendants would not only bill for one improper IMRT course of treatment but multiple boosts of IMRT for individual patients that did not meet the specific Medicare criteria due to inverse planning. While defendants' proffered justification may have been that the tumor size shrank or changed, such a possibility would need to be documented by computed tomography. At times only a few fractions were delivered to the area not allowing time for clinical change to occur. Even if a subsequent treatment plan was prepared, it was not medically necessary or reasonable. Considering that a course of IMRT can be as much as approximately $30,000 per patient compared to the more conventional 3D course of treatment, the aggressive upcoding to IMRT treatment plans was both excessive and profit-driven.

119. Defendants were billing IMRT services irrespective of whether the required work was performed and properly documented. Defendants used the sophisticated radiation equipment on a majority of patients to maximize reimbursement.

120. Despite knowledge of the applicable CPT billing and coding requirements, defendants executed expensive and excessive radiation cancer treatment that was improper and fraudulent. Scarbrough led these false billing practices creating meaningless medical necessity notes and other fraudulent practices to shield defendants' noncompliance. When confronted by MIMA management and repeated audit reports, detailing these improper practices, Scarbrough failed to cease billing in this fraudulent manner. MIMA, likewise, with knowledge of these improper billing practices continued to submit false claims for payment to Federal Health Care Programs.

## VII. FALSE CLAIMS

121. As a result of defendants' fraudulent course of conduct, defendants submitted and caused the submission of false or fraudulent claims to Federal Health Care Programs. These claims were not reimbursable because they were for services not supervised, duplicative and unnecessary services, services not rendered, and upcoded services. The chart set forth below identifies examples of false or fraudulent claims.

31

| Patient | Treatment Dates | Dollars Billed | Dollars Paid |
|---------|-----------------|----------------|--------------|
| A | 1/06-2/06; 6/06-10/06; 1/07-2/07 | $51,538 | $40,966 |
| B | 3/06-6/06; 6/07-08/07 | $72,742 | $58,081 |
| C | 3/07-4/07; 9/07-11/07 | $55,607 | $44,461 |
| D | 11/04-12/04 | $13,628 | $10,902 |
| E | 1/04-2/04; 1/07-2/07 | $63,689 | $49,506 |
| F | 2/04-3/04 | $6,931 | $5,544 |
| G | 1/05-3/05; 7/05-8/05; 11/05; 3/06-5/06; 10/06-11/06; 5/07; 11/07; 5/08; 12/08 | $43,895 | $34,952 |
| H | 08/05-09/05; 03/06 | $8,927 | $7,154 |
| I | 11/06-02/07 | $15,020 | $11,646 |

In order to protect the privacy of the patients, the United States has provided this list without complete names and HIC numbers. However, the United States will provide, concurrent with the service of the complaint, a list with the patient names and the partial HIC numbers to MIMA's counsel.

### FIRST CAUSE OF ACTION
(False Claims Act)
(31 U.S.C. § 3729(a)(1))

122.   The United States repeats and realleges the preceding paragraphs as if fully set forth herein.

32

123.    MIMA knowingly presented or caused to be presented false or fraudulent

Federal Health Care Program claims for payment or approval for radiation oncology

services improperly or never rendered.

124.    By virtue of the false or fraudulent claims of MIMA, the United States

suffered damages and therefore is entitled to treble damages under the False Claims

Act, plus civil penalties of not less than $5,000 and not more than $10,000 as adjusted

by the Federal Civil Penalties Inflation Adjustment Act of 1990.

### SECOND CAUSE OF ACTION
(False Claims Act)
(31 U.S.C. § 3729(a)(2))
(31 U.S.C. § 3729(a)(1)(B))

125.    The United States repeats and realleges the preceding paragraphs as if

fully set forth herein.

126.    MIMA knowingly made, used, or caused to be made or used, false

records or statements – i.e., the false certifications and representations made or

caused to be made by MIMA – material to a false or fraudulent claim.

127.    By virtue of the false records or false statements made by MIMA, the

United States suffered damages and therefore is entitled to treble damages under the

False Claims Act, plus civil penalties of not less than $5,000 and not more than $10,000

as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.

33

## THIRD CAUSE OF ACTION
(False Claims Act)
(31 U.S.C. § 3729(a)(1))

128.   The United States repeats and realleges the preceding paragraphs as if fully set forth herein.

129.   Scarbrough knowingly presented or caused to be presented false or fraudulent Federal Health Care Program claims for payment or approval for radiation oncology services improperly or never rendered.

130.   By virtue of the false or fraudulent claims of Scarbrough, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,000 and not more than $10,000 as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.

## FOURTH CAUSE OF ACTION
(False Claims Act)
(31 U.S.C. § 3729(a)(2))
(31 U.S.C. § 3729(a)(1)(B))

131.   The United States repeats and realleges the preceding paragraphs as if fully set forth herein.

132.   Scarbrough knowingly made, used, or caused to be made or used, false records or statements – i.e., the false certifications and representations made or caused to be made by MIMA – material to a false or fraudulent claim.

133.   By virtue of the false or fraudulent claims of Scarbrough, the United States suffered damages and therefore is entitled to treble damages under the False

34

Claims Act, plus civil penalties of not less than $5,000 and not more than $10,000 as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.

### FIFTH CAUSE OF ACTION
(Unjust Enrichment)

134.   The United States repeats and realleges the preceding paragraphs as if fully set forth herein.

135.   The United States claims the recovery of all monies by which MIMA has been unjustly enriched.

136.   As a consequence of the acts set forth above, MIMA was unjustly enriched at the expense of the United States in an amount to be determined which, under the circumstances, in equity and good conscience, should be returned to the United States.

### SIXTH CAUSE OF ACTION
(Unjust Enrichment)

137.   The United States repeats and realleges the preceding paragraphs as if fully set forth herein.

138.   The United States claims the recovery of all monies by which Scarbrough has been unjustly enriched.

139.   As a consequence of the acts set forth above, Scarbrough was unjustly enriched at the expense of the United States in an amount to be determined which, under the circumstances, in equity and good conscience, should be returned to the United States.

35

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in its favor against defendants as follows:

1.      On the First, Second, Third, and Fourth Counts under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

2.      On the Fifth and Sixth Counts for unjust enrichment, for the damages sustained and/or amounts by which defendants were unjustly enriched or by which defendants retained illegally obtained monies, plus interest, costs, and expenses, and for all such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

The United States demands a jury trial in this case.

Date:  October 16, 2009                Respectfully Submitted,

                                       TONY WEST
                                       ASSISTANT ATTORNEY GENERAL


                                       A. BRIAN ALBRITTON
                                       UNITED STATES ATTORNEY
                                       Middle District of Florida

                                       By:_____
                                       RALPH HOPKINS
                                       Florida Bar # 0972436
                                       Assistant United States Attorney
                                       501 W. Church Street, Suite 300
                                       Orlando, FL  32805
                                       Tel: (407) 648-7562
                                       Fax: (407) 648-7588
                                       Email: ralph.hopkins@usdoj.gov

                                       By:_____
                                       JOYCE R. BRANDA
                                       RENÉE BROOKER
                                       EVA U. GUNASEKERA, Trial Counsel
                                       Attorneys, Civil Division
                                       U.S. Department of Justice
                                       Post Office Box 261
                                       Ben Franklin Station
                                       Washington, DC 20044
                                       Tel: (202) 305-3148
                                       Fax: (202) 514-0280
                                       Email: eva.gunasekera@usdoj.gov

                                       Attorneys for the United States of America

37

## CERTIFICATE OF SERVICE

I certify that this 16th day of October, 2009, the individuals listed below were served with the United States' Complaint by First-Class US Mail, postage pre-paid, addressed to the following counsel of record:

Michael J. Bittman, Esq.
Gray Robinson, P.A.
301 East Pine Street, Suite 1400
P.O. Box 3068
Orlando, Florida 32802-3068

Counsel for Defendant Melbourne Internal Medicine Associates, P.A.


David Evans, Esq.
Mateer Harbert
Suite 600, Two Landmark Center
225 E. Robinson Street
Orlando, Florida 32801

Counsel for Defendant Todd J. Scarbrough, M.D.



Michael A. Sullivan, Esq.
Finch McCranie, LLP
225 Peachtree Street, Suite 1700
Atlanta, Georgia 30303

G. Mark Simpson, Esq.
Simpson Law Firm, LLC
165 North Main Street
Jonesboro, GA 30236

Counsel for Relator Fred Fangman

Eva U. Gunasekera