UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**UNITED STATES OF AMERICA ex rel.**
**FRED FANGMAN,**

                **Plaintiff,**            Case No. 6:08-cv-1095-Orl-31DAB

v.

**MELBOURNE INTERNAL MEDICINE**
**ASSOCIATES, P.A.**

                **Defendant.**

## DECLARATION OF MICHAEL A. SULLIVAN IN SUPPORT OF RELATOR'S APPLICATION FOR FEES AND EXPENSES

1.

I am a partner with the law firm of Finch McCranie, LLP in Atlanta, where I have practiced since 1996. I am a 1984 graduate of Vanderbilt Law School, where I served as Senior Articles Editor of the *Vanderbilt Law Review*, and was elected to Order of the Coif.

2.

From August 1984 until September 1986, I served as Law Clerk to the Honorable Marvin H. Shoob, United States District Judge for the Northern District of Georgia. During that federal clerkship, I was admitted to the Bar of the State Bar of Georgia in 1985, and have been a member of the Georgia Bar continuously since then for 25 years.

3.

I began practicing law in 1986 with another well-regarded litigation firm in Atlanta, Bondurant, Mixson & Elmore, LLP. I became a partner at that firm in 1994. I have had an "AV"

rating with Martindale-Hubbell for at least the past fifteen years. I moved to my current firm as a partner in 1996, when now U.S. District Judge Thomas Thrash (N.D. Ga.) left the partnership of my current firm for the bench.  A true and correct copy of my current Martindale-Hubbell listing is attached as Exhibit 1.

4.

I began working with the False Claims Act in 1988, as defense counsel in an early False Claims Act (FCA) case that grew out of a bid-rigging prosecution that we defended, *United States v. Dynalectric Co.*, 859 F.2d 1559 (11th Cir. 1988). Opposing counsel included Department of Justice Civil Fraud Division attorney Carolyn Mark, who since became a senior member of DOJ's Civil Fraud Branch. In addition, my practice at my original firm consisted of other complex civil litigation, as well as white collar criminal defense and tort litigation.

5.

From 1995-98, at the request of Independent Counsel Larry D. Thompson (who later served as Deputy Attorney General of the United States), I served as a federal prosecutor in the Independent Counsel investigation of the Department of Housing and Urban Development. Among the cases in which I served as Associate Independent Counsel was the prosecution of a former cabinet member, former Secretary of Interior James Watt. I maintained my private law practice as well.

6.

Beginning with the 1988 FCA case mentioned above, I have served both as defense counsel and as relator's counsel in False Claims Act cases, including advising clients on potential FCA exposure and issues.  Over the past five years, more and more of my time has been devoted to FCA cases, and at present more than 75% of my practice is representing relators and IRS

whistleblowers. For the past approximately three years, I have represented only relators in FCA litigation, in cases filed in numerous states including Florida, California, Georgia, Tennessee, Ohio, and Kansas.

7.

In 2007, I was requested by members of the Georgia Legislature to testify about the False Claims Act in all of the legislative hearings concerning the bill to enact Georgia's new State False Medicaid Claims Act. In addition, I was asked by the legislative sponsor of that bill to participate in its drafting, which I did. I was the only private attorney requested to testify in any of the legislative hearings. (Attached as Exhibit 2 is an article I published describing the enactment of this new state FCA, in the October 2007 *Georgia Bar Journal*).

8.

I have written several articles and papers on the False Claims Act and the wave of new False Claims Acts being enacted by the states, and I have been frequently requested to speak or serve as a panelist at seminars on the False Claims Act, including those listed as follows: Health Care Compliance Association's *Compliance Today*, "New State 'False Claims Acts': An Executive Summary for Compliance Professionals" (September 2007); Georgia Bar Journal, "A 'False Claims Act' Is Finally Enacted in Georgia" (October 2007); "Handling Cases Under the False Claims Act and the New State False Medicaid Claims Act," GTLA, 2007. Moderator, "State False Claims Acts," Southeastern Health Care Fraud Conference, ICLE of Georgia, 2007. Panelist, "False Claims Act Developments," Southeastern Health Care Fraud Conference, ICLE of Georgia, 2008 & 2009. Co-Chair: "Whistleblower Law Symposium," ICLE of Georgia, 2007-08. As noted, twice in recent years I have served on panels on the False Claims Act at the Southeastern Health Care Fraud Conference with defendant MIMA's co-counsel John (Jack)

Boese of the Washington, D.C. office of Fried, Frank Harris, Shriver & Jacobson LLP. In addition, in September, I will be joining Richard Shackelford of King and Spalding, LLP in speaking at the 2010 American Health Lawyers Association/Health Care Compliance Association's "Fraud & Compliance Forum" in Baltimore, Maryland, to discuss recent changes to the False Claims Act that are important to health care professionals.

9.

In 2008, I was engaged as special counsel to relator Ven-A-Care of the Florida Keys, Inc., in a False Claims Act case originating in Miami and being prosecuted by the U.S. Attorney for the Southern District of Florida, *United States ex. rel. Ven-A-Care of the Florida Keys, Inc. v. Abbot Laboratories*, et al. (which became part of MDL proceedings in another district). I charged my standard hourly rate at that time at $475.00 for professional services in representing the relator, and was compensated at that hourly rate. In December 2009, my hourly rate increased to $495.00. In False Claims Act cases, I have since billed and collected at that $495 hourly rate for consultation about FCA liability and FCA issues. In arriving at these rates, I considered rates charged by other attorneys of comparable background and years of experience. At larger firms, rates charged by persons of similar background and experience are often considerably more than $500 per hour.

10.

I am the senior attorney of two attorneys who performed all substantive work in representing the Relator in this action. I was contacted by the Relator in early 2008.

11.

Because of the complexity of the False Claims Act and its unique procedural requirements, my approach has been to staff False Claims Act cases very leanly. Rather than

staff a case with a number of associates who may not be familiar with the False Claims Act, it is my practice to join with one or more other experienced FCA counsel in representing clients, depending on the needs and demands of the case.

12.

In this case, the case was leanly staffed with myself and only one other attorney, G. Mark Simpson, who has been practicing law for more than eighteen years and has considerable FCA experience, as is reflected in his separate Declaration. In addition, while within my firm we often have multiple lawyers working on a single case, that did not occur in this action, as all of the substantive work was performed by myself and Mr. Simpson. Our local counsel, James Gustino, was not asked to perform any of the substantive work, and was compensated on a flat fee basis that is not part of this Fee Application.

13.

In this case, Relator's counsel staffed the case in such a way as to avoid duplication or wasted effort by counsel. Although Mr. Simpson is very experienced in FCA cases, he has had approximately eighteen years of practice, as opposed to my twenty-four years of practice. Mr. Simpson thus bills at a slightly lower rate, and he took the initial "cut" at researching the technical requirements and the various medical procedures, relevant regulations, and other authorities, as well as performing the initial drafting of the Complaint and Disclosure Statement provided to the government. In our effort to divide labor efficiently, I would typically review and revise these documents. Both Mr. Simpson and I reviewed the evidence in support of Relator's Complaint, although for division of labor purposes Mr. Simpson took the lead in organizing it. I took the lead in communications with the Relator so as to evaluate and develop the case, as well as in the ongoing communications with government counsel and government investigators from

the early stages of the case, to its completion. Mr. Simpson and I each collaborated on memoranda analyzing legal issues and supporting evidence, to address questions raised by the government. Mr. Simpson and I worked together in performing for the government analyses of the evidence needed to expose the defendants' "sham" procedures designed to cloak their fraud in this action, so as to assist the government both in pursuing its investigation and in negotiating the $12 million settlement.

14.

Government counsel and Relator's two attorneys successfully used the "public-private" partnership model, which is more and more widely used in False Claims Act litigation. This model allows the government to leverage its limited resources by calling on the resources provided by private attorneys. This was effectively a "joint prosecution effort" in which the government counsel and investigators relied on Relator's counsel at each stage, from the beginning of its investigation, to obtaining input for preparation of subpoenas for documentary evidence from the defendants, to review of evidence compiled by the government in response to subpoenas, to evaluation of the responses and explanations that defendants attempted to provide in the face of evidence about these "sham" procedures designed to cloak the fraud, to preparing analyses and summaries of evidence rebutting the defendants' arguments, to performing research that ultimately would be used by the government to rebut the defendants' arguments, to performing damages calculations and marshaling arguments in support, to consulting with the government on negotiation strategies and steps to be taken to resolve the matter, and to finally document the $12 million settlement.

15.

To illustrate, the undersigned's attached billing records reflect more than 50 consultations with government counsel and/or government investigators by telephone. Typically, government counsel would telephone Relator's counsel to obtain input not only as to the facts known by Relator, but also as to the Relator's counsel's evaluation of the evidence being subpoenaed and analyzed, and to assist the government is responding to the defendants' arguments. In addition, there were numerous other phone calls that are not captured by the undersigned's records for the same purpose. Moreover, there was a multitude of email correspondence back and forth between Relator's counsel and government counsel, for the same purposes as outlined above in assisting the government at each stage of the litigation. The undersigned's billing records reflect more than 50, but not all were separately recorded.

16.

If there is any doubt whatsoever as to the degree to which the government leveraged its own resources by relying on Relator's counsel, that doubt should be eliminated by the 22% Relator share's agreed to by the government, which is rare in these cases.

17.

Further, without Relator's counsel's ongoing involvement, there may have been no recovery, much less a $12 million recovery. In one of the early discussions with government counsel, the government saw the various procedures carefully designed by MIMA to "cloak" the fraud. The government raised the question whether the government would ever be able to prove, for example, that the MIMA physicians never bothered to review the emailed images sent before IGRT treatments in which patients received radiation therapy, which emails were designed to give the appearance that the MIMA physician was in fact personally supervising the

administration of radiation to the patients. Based on the undersigned's experience in past cases involving forensic examination of data storage devices, Relator's counsel contacted and retained an expert who consulted with both Relator's counsel and the Government as to how the "sham" nature of these cell phone procedures could be exposed, if in fact the images were not being reviewed. Relator's counsel used this expert's input to provide a "road map" to the government as to what data files needed to be subpoenaed from MIMA and from AT&T to prove the actual usage of these devices. As the government found through its investigation and later alleged in its Complaint, the data records subpoenaed showed that these cell phones were hardly used at all, which thus unmasked this aspect of the defendants' fraudulent practices.

18.

As yet another contribution to the government's successful efforts to bring this case to a conclusion, Relator's counsel worked closely with the government and Relator to ensure that a variety of apparent efforts made by senior MIMA personnel (a) to alter or conceal evidence, and (b) to influence lower-level personnel at MIMA to withhold information from the government, were unsuccessful. These activities by senior MIMA personnel were not only disturbing, but also were dangerous if they succeeded in obstructing the government's search for the truth in its investigation. To illustrate, the following are several examples of such conduct that were reported to Relator's counsel:

a. Shortly after MIMA received a subpoena from the government in its investigation, a MIMA physician instructed Relator on or about Thursday, January 8, 2009 that certain policies and procedures needed to be altered and "back dated" to make it appear that the new version had an earlier date. Both to prevent a violation of the law and to prevent MIMA officials from succeeding in thwarting the government's investigation, Relator's counsel worked closely with

the government to ensure that steps were taken so that neither result occurred. Based on counsel's close coordination with the government, Relator's counsel and Relator ensured that both the original version and "altered" version were preserved for the government's investigation, and that the altered, backdated policies and procedures with the MIMA physician's handwritten alterations were available in the government's investigation.

      b. Similarly, Relator's counsel was obliged to report to the government that, shortly after the government's subpoena arrived, senior MIMA personnel visited Relator and stated to Relator, whom they had asked to assist in gathering documents, that certain "internal audits" at MIMA should be "destroyed" because they could be "discoverable." This activity by MIMA officials concerning destruction of documents that had been subpoenaed by the government obviously threatened the integrity of the government's investigation, and required close monitoring and coordination by Relator's counsel with government counsel to ensure that the government's investigation was not impeded.

      c. Yet again, Relator's counsel reported to the government a senior MIMA official's taking Relator aside to discuss how Relator might help "prepare" lower-level employees for interviews with the government. The senior MIMA official told Relator that the witnesses did not need to tell all that they knew when interviewed by the government, in particular the MIMA physicians' lack of personal supervision of radiation oncology procedures. When Relator objected that something other than the truth be presented, the MIMA official reiterated that the employees did not need to tell the government all they knew and had observed. These efforts by a MIMA official apparently intended to obstruct witnesses' testimony and change what MIMA employees would say to government investigators thus also required close consultation between Relator's counsel and government counsel, to ensure the integrity of the government's

investigation.

d. As another example, during the investigation another MIMA physician made statements before a group of MIMA employees gathered, which statements appeared designed to create the false impression that the cell phone "reviews" of radiation oncology procedures were actually being regularly performed by the MIMA physicians, when in fact, the data proved that they were not.

19.

All of these activities by senior MIMA officials to alter or withhold evidence or apparently to influence how candidly and freely witnesses would speak when interviewed by the government, made it essential to have regular and frequent monitoring of reports provided by Relator on an ongoing basis. That process concluded once MIMA was informed that Relator had been cooperating with the government, at which time MIMA within seventy-two hours removed Relator from his position, and ultimately fired him. The monitoring and close communication with the government by Relator's counsel obviously was essential to protect the integrity of the government's investigation, and to prevent such acts from interfering with the government's investigation.

20.

Relator's counsel also participated in numerous conferences between government representatives and Relator. These included two in-person lengthy meetings in the Orlando area, as well as numerous follow-up telephone interviews in which Relator's counsel participated and the government discussed with Relator's counsel issues in its ongoing investigation.

21.

Attached as Exhibits 3 and 4 are true and correct copies of the time and billing statements of my firm, which reflect the services and expenses necessarily and reasonably required in my representation of Relator in this action, and which are the subject of the accompanying Fee Application. For simplicity, the services of my firm in submitting this Fee Application are set forth in Exhibit 4, while Exhibit 3 includes the other time and expense of my firm in the case. The limited redactions that appear are to preserve the attorney-client privilege and work product, and Relator's counsel is willing to provide the unredacted billings to the Court *in camera*.

22.

Removed from, and thus not included in, the billing records for which Relator's counsel seek reimbursement are separate consultations with Relator concerning "employment" issues, relating to MIMA's retaliation by removing Relator from his position immediately after learning that Relator had been cooperating with the government, and then ultimately by firing Relator. Those time entries have been segregated and excluded from this fee application.

23.

In addition, I have exercised billing judgment, and I have also not billed for what amounts to substantial time spent discussing the case with co-counsel, reviewing routine emails and documents sent by the government or co-counsel, and other items I did not believe significantly contributed to the progress of the case. Nor did I include in my billing Relator's counsel's recent efforts to see if this issue could be mediated and resolved by agreement.

24.

Relator's Fee Application discusses many of the aspects of FCA litigation that present particular challenges and pitfalls, which thus require the need for experienced FCA counsel. Those portions of the Application are incorporated herein by reference.

25.

Attached as Exhibit 5 is a true and correct copy of the 2009 *National Law Journal* Billing Survey, which the undersigned obtained on July 21, 2010 directly from the *National Law Journal's* web vendor. It reflects billing rates discussed in the accompanying Application.

26.

As confirmed by the opinions stated in the Declarations of other counsel provided in support of this Fee Application, the 2009 *National Law Journal* Billing Survey, as well as the undersigned's own knowledge:

(a) Relator's counsel's hourly billing rates of $475 for me, and $425 for G. Mark Simpson, respectively, are reasonable not only compared with rates within the Middle District of Florida by attorneys of reasonably comparable skill, experience, and reputation in complex civil litigation, but also compared with rates in the market for experienced FCA attorneys. In fact, our rates are actually lower than those of many attorneys of reasonably comparable skill, experience, and reputation.

(b) The services provided and the time spent by Relator's counsel as reflected in the time and billing records referred to in the Fee Application were reasonable and necessary to the prosecution of this action, especially in light of the successful result for the government. Relator's counsel worked efficiently in helping bring about this recovery of damages for defendants' fraud against the United States.

27.

As to the expenses listed in the attached billing records, they were all reasonable and necessary for the successful prosecution of this action. In the travel to the Middle District of Florida for Relator interviews, counsel flew "coach." The undersigned believes that the expenses totaling $2,740.10 are self-explanatory, but clarifies that the fees for "investigation services – Forensic Strategy Services" was for expert consultation described above in order to prove that the MIMA cell phone "reviews" of patient treatments did not occur, and were but a "sham," in the words used in the Government's Complaint. (The undersigned believes that the expert did not charge Relator's counsel for all time spent, perhaps because the expert and the undersigned had had prior matters together.)

28.

I have discussed and confirmed with counsel for defendant MIMA and government counsel that MIMA retained for this matter not only its Orlando law firm GrayRobinson P.A., but also at least two attorneys who I understand are partners in the Washington, D.C. office of Fried, Frank Harris, Shriver & Jacobson LLP, John (Jack) Boese and Beth McClain.

29.

In an effort to resolve the fee claim, I provided to MIMA's counsel on January 7, 2010, the billing rates, hours to date, and redacted time records of Relator's counsel in this action. I have suggested that defendants provide the same information at least as to rates, total hours, and total billings, since that information has been held relevant to a successful party's fee application. I have reiterated that request since then, but to date Relator's counsel has not received this information from defendants.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

*[signature]*

Executed this 28 day of July, 2010.